UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Case No.:13-CV-00323-JL

JURY TRIAL DEMANDED

ROBERT STOCKMAN

v.

WELLS FARGO HOME MORTGAGE,
A DIVISION OF WELLS FARGO BANK, N.A.;
THE FEDERAL NATIONAL MORTGAGE
ASSOCIATION; and CANDACE STOCKMAN

**FIRST AMENDED COMPLAINT**
**SEEKING DAMAGES AND SPECIFIC PERFORMANCE**

NOW COMES Robert Stockman (hereafter "Stockman" and/or "Plaintiff") by and through his attorney and complains against Wells Fargo Home Mortgage, a Division of Wells Fargo Bank, N.A. (hereafter "Wells Fargo" and/or "Defendant"), The Federal National Mortgage Association (hereafter "Fannie Mae" and/or "Co-Defendant") and also against Candace Stockman (hereafter "Candace"), stating as follows:

## I. PARTIES

1. Stockman is a natural person with a principle place of residence at 44 Daroska Road, Pittsfield, New Hampshire 03263 (hereafter the "residence" and/or "home").

2. Candace Stockman is a resident of New Hampshire with a principal place of residence at 111 Fairview Street, Pittsfield, New Hampshire 03263.[1]

3. Wells Fargo is a National Association with a principal place of business at 1 Home Campus, Des Moines, Iowa 50328-0001.

---

[1] Candace Stockman is named as an interested party to this Complaint, under Rule 19.

4.      Fannie Mae is a Corporation duly established under the laws of the United States of America, having a principal place of business at P.O. Box 650043, Dallas, Texas 75265-0043.

## II.     JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to diversity jurisdiction set forth in 28 U.S.C. §1332(a) as the parties are citizens of different states and the amount is controversy exceeds $75,000.00, exclusive of interest and costs.

6.      That, in addition, this Honorable Court has subject matter jurisdiction as some of the claims against the Defendants involve Federal Law and The Fair Debt Collection Practices Act.  28 U.S.C. §1331.

7.      That lastly, this Honorable Court has original Jurisdiction over Fannie Mae, pursuant to 12 U.S.C. § 1723a(a).

8.      Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 because the real estate, at issue in all of Plaintiff's complaints, is located physically here in the State of New Hampshire.

## III.    FACTS COMMON TO ALL COUNTS

### A.  THE HAMP MODIFICATION PROCESS AND DUTIES

9.      In the midst of a "mortgage crisis" resulting in a dramatic rise in foreclosures, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it, with this American Recovery and Reinvestment Act of 2009 on February 17, 2009 (hereafter collectively together "the Act").  12 U.S.C. §5201 et. seq. (2009).

10.     The purpose of the Act was to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."  Id.

11.     The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program (hereafter "TARP").  12 U.S.C. §5211.

12.     Under TARP, the Secretary of the Treasury may purchase or make commitments to purchase troubled assets from financial institutions. Id.

13.     In exercising its authority to administer TARP, the Act mandates that the Secretary of the Treasury "shall" take into consideration the "need to help families to keep their homes and to stabilize communities."  12 U.S.C. §5213 (3).

14.     The Act further mandates, with respect to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C. §5219.

15.     The Act provides authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." Id.

16.     The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures.  12 U.S.C. §5220.

17. On February 18, 2009, pursuant to the authority under the Act, the Secretary of the Treasury announced the Making Home Affordable Program (hereafter the "Program").

18. The Program consists of two sub-programs. The first sub-program relates to the creation of refinancing products for individuals with minimal, or negative equity, in their home and is now known as the Home Affordable Refinance Program.

19. The second sub-program relates to the creation and implementation of a uniform loan modification protocol and is known as the Home Affordable Modification Program (hereafter "HAMP").

20. That HAMP is the sub-program that is at issue in this case.

21. On March 4, 2009, in response to the HAMP sub-program above, the Secretary issued uniform guidance for loan modifications across the mortgage industry (hereafter the "Guidelines"). See Exhibit 1 affixed hereto.

22. In response to the same, on March 4, 2009 Fannie Mae issued Announcement 09-05, which was subsequently modified and reissued as Announcement 09-05R on April 21, 2009 (hereafter the "Guide")[2].

23. That the Guide was issued for all servicers, including but not limited to Wells Fargo, for all eligible Fannie Mae portfolio mortgage loans and MBS pool mortgage loans guaranteed by Fannie Mae.

24. The Guide mandated all servicers, including but not limited to Wells Fargo, to "use a uniform loan modification process to eligible borrowers."

[2] This Complaint has been filed with the understanding and belief that Announcement 09-05R applies to Stockman's loan. To the extent Announcement 05-09R does not apply and Fannie Mae's Supplemental Directive 09-01 applies, upon the filing of an Answer which denies the applicability of Announcement 09-05R, Stockman intends to amend this Complaint to the full extent allowed under Rule 15.

25.     That copies of the Guide and the amended Guide, dated April 21, 2009 are attached to this Complaint, and the statements contained in both are incorporated in this Complaint by way of reference.  Exhibit 2 affixed hereto.

26.     That the Guide imposed duties on Wells Fargo, as a servicer of Fannie Mae loans, in part, for the benefit of borrowers.

27.     That the guidelines imposed underwriting duties for HAMP Modifications on Wells Fargo, as Fannie Mae's servicing agent.  See page 4 of the Guide.

28.     That one of the underwriting duties imposed by the guidelines, included "compliance with applicable laws" including, but not limited to, Federal, State and local laws.  See page 12 of the Guidelines and page 14 of the Guide.

29.     Specifically referenced in the Guidelines and the Guide, were compliance with applicable laws, including the duty of the servicer to comply with:

a. the Equal Credit Opportunity Act; and

b. the Fair Debt Collection Practices Act.

30.     That the Guide and Guidelines imposed a "modification process."  See Guide, page 14.

31.     That one of the duties, in the modification process, held by Wells Fargo as a servicer of Fannie Mae loans was "document retention."  See Guide, page 15.

32.     That, by and through this pleading, Stockman calls upon Wells Fargo and Fannie Mae to preserve all repositories of Electronically Stored Information ("ESI") and to place all such repositories on Litigation Hold.

33.     That the Guidelines and Guide imposed a duty, upon Wells Fargo as a servicer for Fannie Mae, to "retain all documents and information received during the

process of borrower eligibility, including “records of borrower solicitations or borrower initiated inquiries regarding the HAMP, the outcome of the evaluation for modification under the HAMP and other requirements. See pages 15 and 16 of the Guide and page 13 and 14 of the Guidelines.

34. That in addition, the Guidelines and Guide, as they relate to the modification process, impose upon Wells Fargo, as a servicer for Fannie Mae loans, to provide borrowers at risk of foreclosure with the opportunity to apply for a HAMP Modification.

35. That the duty to provide borrowers with a duty to apply for a HAMP Modification required servicers, such as Wells Fargo, to not proceed with a foreclosure sale until the borrower has been evaluated for the program and, if eligible, an offer to participate in the HAMP has been made.

36. That the aforementioned duty to suspend foreclosure proceedings also “must not conduct foreclosure sales on mortgage loans previously referred to foreclosure **or refer new mortgage loans to foreclosure** during the thirty (30) day period that the borrower has to submit documents evidencing an intent to accept the trial period plan offer.” See page 16 of the Guide.

37. That a further duty, imposed by the guidelines on Wells Fargo, as a servicer of Fannie Mae loans, was to offer all eligible borrowers with a 90-day Trial Payment Period (hereafter “TPP”).

38. That in addition, another duty imposed by the guidelines on Wells Fargo, as a servicer for Fannie Mae loans, was to offer all borrowers, who successfully complied with the TPP conditions, a HAMP Modification.

## B. ROBERT STOCKMAN'S OWNERSHIP AND MORTGAGE

39. That on or about April 22, 2005 Stockman and his wife purchased the real estate where he now resides. Candace Stockman no longer resides at this residence but, she remains an owner of record.

40. That at the time of purchase, the land was vacant and raw, in a natural state, with no dwelling or abode.

41. That subsequent to purchase, Stockman built a home for himself and his family.

42. That deeds reflecting the Stockman ownership of the residence are recorded in the Merrimack County Registry of Deeds at Book 2772, Page 678 and also, Book 2880, Page 1363.

43. On or about February 28, 2008 Stockman signed a promissory note and mortgage, payable to Wells Fargo, in the principal amount of $221,000.00.

44. That the above described mortgage was secured by the Stockman residence.

45. That the above described note and mortgage were for a term of twenty (20) years.

46. That the aforementioned mortgage is recorded in the Merrimack County Registry of Deeds at Book 3050, Page 1629. See copy attached hereto as an Exhibit 3.

47. That subsequent to the Act being signed by President Obama, in March of 2009, Stockman's wife (hereafter "Candace") left him and filed for divorce, against Stockman.

48.     That when his wife left him, Stockman was left to care for his two sons, Tyler and Kyle, ages 14 and 9, (respectively) at the time.

49.     That as a result of the above, Stockman became the primary caregiver for his children, including his youngest son Kyle, who was diagnosed with Type I Diabetes a year and one-half preceding Stockman's abandonment by Candace.

50.     That at the time she left Stockman, Candace ceased contributing to payment of all household expenses including, but not limited to, the mortgage expenses for Stockman and his children.

51.     That knowing he would get into financial trouble because of the divorce and because of the wide publicity of the Act in the news media, Stockman engaged a third-party to assist him in attempting to get a HAMP Modification.  As without financial contribution by Candace, Stockman could no longer afford the mortgage payments.

52.     That Stockman retained Bisco Realty LLC (hereafter "Nahed") to act on his behalf in obtaining a HAMP Modification from Wells Fargo.

53.     That after signing an agreement to represent Stockman in the HAMP process in April of 2009, Nahed submitted documentation to Wells Fargo along with a hardship request for a HAMP Modification of Stockmen's loan.

**C.  ROBERT STOCKMAN'S HAMP PROCESS**

54.     That at the start of the HAMP application process in April 2009, Stockman was current on his mortgage obligations to Wells Fargo under the note.  At that time, Wells Fargo was the holder of the Note and Mortgage.

55.     Subsequent to the start of the HAMP process, as he anticipated, Stockman ceased receiving financial contribution from Candace and he began to fall behind in his monthly payments.

56.     That by mid-June of 2009, Stockman was one month behind on his mortgage payment and by the first of July, he was two months behind.

57.     That on or about July 20, 2009 Stockman received a telephone communication, from Wells Fargo, that his loan might go into foreclosure if he did not get caught up on his late payments.

58.     That the aforementioned telephonic call was made, notwithstanding Stockman's participation and HAMP documentation submission, which had still not been acted upon.

59.     That over the course of the next few months (April 2009 through September 2009), Nahed made numerous inquiries as to the status of Stockman's HAMP requests and received no response other than general statements about the loan being in "review."  In addition, Stockman and Nahed diligently provided Wells Fargo with all paperwork and documents they request for the HAMP review.

60.     That without acting on the initial HAMP request, Wells Fargo subsequently requested that Stockman submit another completely new request and documents and another set of documents was sent on September 30, 2009, by fax.

61.     That again, on October 19, 2009, a third set of HAMP documents was sent, this time containing Stockman's signature on each page.

62.     That the third set of documents was sent by fax and also US Mail, postage prepaid, on October 19, 2009.

63. That by the end of October, 2009, Stockman was five months behind on his mortgage payments and was still waiting for an answer on his HAMP application, despite numerous promises from employees of Wells Fargo that is was “in review” and he would be given an answer to the application.

64. That during the period from September 2009 and ending at the end of October 2009, Stockman and Nahed had numerous telephonic communications with employees of Wells Fargo and provided these same employees with duplicative records and multiple applications, for the HAMP Modification.

65. That notwithstanding the above, October 23, 2009 Nahed was informed that “collection” efforts had begun by Wells Fargo for the unpaid monthly mortgage payments, notwithstanding the many months and unresolved HAMP Modification process, which had not been acted upon by Wells Fargo.

66. That two days later, on October 25, 2009, Stockman received a phone call advising him that Wells Fargo was in the process of foreclosing, notwithstanding the ongoing HAMP Modification process, which had not been acted upon by Wells Fargo for the prior six (6) months.

67. That upon learning that a foreclosure process had commenced, Stockman contacted Nahed who immediately spoke with Wells Fargo and was advised that Stockman’s mortgage was “not in active foreclosure,” (according to Wells Fargo’s employees who were processing the HAMP Modification). Further said Wells Fargo employees requested another hardship letter (part of the application) and accompanying documents which, Stockman again resubmitted on November 3, 2009.

68.     That notwithstanding the foregoing statement, on November 9, 2009 Nahed was subsequently notified by Wells Fargo that Stockman's loan was in "active foreclosure," notwithstanding the ongoing HAMP Modification process.

69.     Three days later, on November 12, 2009 Wells Fargo assigned the mortgage to Fannie Mae, as shown by the Assignment affixed hereto.  See Exhibit 4.

70.     That at all times subsequent, Wells Fargo was the servicing agent for its principal, Fannie Mae, and it acted on Fannie Mae's behalf and subject to its control, as described in the Guide affixed hereto as Exhibit 2.

71.     Four days later, on November 16, 2009 the assignment of the Stockman mortgage to Fannie Mae was recorded in the Merrimack County Registry of Deeds.  In addition, that same day, Stockman received written notice that a foreclosure sale was scheduled for December 14, 2009.

72.     That after receiving notice of the scheduled foreclosure sale, Stockman and Nahed again, immediately telephoned and spoke with the Wells Fargo HAMP employees, again seeking approval of Stockman's HAMP Modification request.

73.     That Stockman and Nahed both requested that the foreclosure be cancelled, due to many months of HAMP requests, without action, or answer, by Wells Fargo.

74.     That after the assignment of the mortgage to Fannie Mae, Wells Fargo remained the servicing agent handling the Stockman mortgage and loan documents, including the HAMP application Wells Fargo was processing for Fannie Mae.

75.     That Wells Fargo employees instructed Nahed to have Stockman send a written request to postpone the December 14, 2009 foreclosure sale, because of the HAMP process and assured Nahed the request would be granted.

76.     That because of the ongoing HAMP process, Wells Fargo agreed to postpone the December 14, 2009 foreclosure sale date and said agreement was verbally reached with Nahed on December 9, 2009.

77.     Two days later, Wells Fargo asked for updated paystubs, from Stockman and those were supplied to Wells Fargo.

78.     That the foreclosure sale on December 14, 2009 was postponed and continued to January 22, 2010.

79.     That during the postponement, both Stockman and Nahed, repeatedly, asked Wells Fargo to approve the HAMP Modification and also asked for a cancellation of the continued sale.

80.     That Wells Fargo employees instructed Nahed to have Stockman send a request to postpone the second foreclosure sale and assured Nahed that such a request would be granted, because of the ongoing HAMP process.

81.     That prior to the January 22, 2010 foreclosure sale, Wells Fargo still did not have any response, either positive of negative, on Stockman's requested HAMP Modification and thus, Wells Fargo and Stockman agreed to postpone the sale, from January 22, 2010 to February 19, 2010.

82.     That during the period between January 22, 2010 and the rescheduled foreclosure date of February 19, 2010, Stockman provided additional documents, in the form of paystubs, as requested by Wells Fargo.

83.     In addition, Nahed made repeatedly telephonic requests for an answer to the HAMP Modification, after the postponement of the second foreclosure sale date.

84.     Further, per the instructions from the Wells Fargo employee to Nahed on February 12, 2010, Stockman sent a third letter to Wells Fargo requesting postponement of the February 19, 2010 sale.

85.     That prior to the February 19, 2010 foreclosure sale, Nahed spoke with Wells Fargo and was informed, once again, that the sale would be postponed.

86.     That notwithstanding the same, the aforementioned Wells Fargo employee who agreed to postpone the sale knew or, should have known, that the sale would not be postponed and he deliberately made false statements to Nahed with callous and reckless disregard for the truth.

87.     That in reliance upon said statement and based upon the course of conduct which had occurred in the other two sales, Stockman took no action to enjoin the sale, as is his right under NH RSA 479:25 (and as further advised in the written foreclosure notices sent to him, by the law firm conducting the foreclosure).

88.     That notwithstanding the verbal statements by Wells Fargo that the sale would be postponed, the sale was not postponed and on February 19, 2010 Stockman's home was sold at foreclosure, to Fannie Mae, for the sum of $231,152.52, as shown be the foreclosure deed affixed hereto.  See Exhibit 5.

89.     That a few days later, on or about February 24, 2010, Stockman first learned that the foreclosure sale had not been postponed.

90.     That upon discovering that the foreclosure sale had not been postponed, as promised, Stockman was in contact with Wells Fargo and spoke to "Bonnie."

91.     Than Bonnie informed Stockman that someone in Wells Fargo's office had "screwed-up" and failed to notify the foreclosure attorney to postpone the foreclosure sale a third time.

92.     That Bonnie subsequently spoke with Nahed who advised that Stockman should write a letter requesting rescission of the foreclosure sale.

93.     That following the conversation with Bonnie and because of her representation over the phone, Stockman was caused to believe that the sale would be cancelled and the foreclosure deed would not be signed or recorded at the Registry of Deeds.

94.     That after being told that the foreclosure deed would not be recorded, subsequent phone conversations, in the days that followed, had Wells Fargo employees making statements denying responsibility for failing to cancel the sale and said employees also indicated that they lacked control over preventing the recording of the foreclosure deed.

95.     That notwithstanding Wells Fargo's denial of responsibility, Stockman and Nahed, based upon instructions from Wells Fargo employees, immediately prepared and sent a letter requesting "rescission" of the foreclosure sale and deed.

96.     That notwithstanding all of the foregoing and the Guidelines of Fannie Mae, on its servicers, including, but not limited to Wells Fargo, there was no rescission of the foreclosure and on March 4, 2010, the attached foreclosure deed was recorded in the Merrimack County Registry of Deeds at Book 3182, Page 1104.

97.     That Wells Fargo knew the foreclosure deed was recorded, notwithstanding the above HAMP process, which remained ongoing, at the time of foreclosure.

98.     That Wells Fargo deliberately recorded the foreclosure deed, notwithstanding its representations prior to the sale, described above.

99.     Approximately two weeks later, on March 17, 2010, Stockman was served with an eviction notice, by Wells Fargo, notwithstanding the continuing ongoing HAMP Modification process and Stockman's many months of waiting for a decision by Wells Fargo.

100.    That after receiving the eviction notice, both Stockman and Nahed made additional phone calls and communications to Wells Fargo and Stockman's file was transferred to Wells Fargo employee, Vong Kavan (hereafter "Vong"), Executive Mortgage Specialist, Office of the President.

101.    That on March 19, 2010 Vong sent Stockman a letter acknowledging receipt of his request to rescind the foreclosure.

102.    That again, on April 7, 2010, Wells Fargo sent Stockman another form letter, signed by Vong, looking for the same HAMP documents which had been supplied to Wells Fargo, prior to that date, on multiple occasions.

103.    That the request from Vong re-started the HAMP process in its entirety, notwithstanding the failure of Wells Fargo to act on any of Stockman's earlier HAMP efforts.

104.    That five days later, on April 10, 2010, Stockman resubmitted another hardship letter and request and for financial documents, signing and dating the same,

and sending them to Vong.  Included in this package was another request to rescind the foreclosure.

105.    That approximately six weeks later, after Stockman and Nahed had numerous conversations and communications with Wells Fargo (additionally supplying any and all requested information by Wells Fargo and/or Vong), on May 27, 2010 Nahed was advised:

- That the foreclosure deed would be "removed" from the records;

- Stockman's mortgage would be reinstated;

- that a TPP and HAMP Modification would be approved; and

- Stockman should ignore the TPP letter he would be receiving in the mail and should merely begin making his payments, under the HAMP Modification, after signing and returning the HAMP Modification Agreement and package that would be forthcoming.

106.    That the aforementioned statement to Nahed was provided by Joel Havick, of the Executive Office of the President at Wells Fargo.

107.    That because of the promises made above, Nahed advised Stockman that he still owned his residence and he would be receiving a HAMP Agreement which he should sign.

108.    That believing the residence was his again, Stockman paid his homeowner's insurance policy for the coverage on his home, which cost approximately $1,000.00, as the insurance policy was up for renewal in June.

109.    That in June, Stockmen sent to Wells Fargo $1,600.00 to apply to his loan.

110.    Subsequent to the above, by letter dated July 2, 2010, HAMP sent Stockman a HAMP Modification Agreement and letter which was signed and returned by Stockman shortly thereafter.  See Exhibit 6.

111.    That at the time he executed the HAMP Modification Agreement, because of statements by Wells Fargo described above, Stockman thought he again owned his residence.

112.    That Stockman paid his first payment, which was processed by his bank on September 2, 2010.

113.    The aforementioned mortgage payment was a HAMP Modification reducing Stockman's monthly mortgage obligation to $1,422.00 per month.

114.    That subsequent to all of the above, Stockman resumed making his mortgage payments to Wells Fargo under the HAMP Modification.

115.    That following the events described above, Wells Fargo knew the foreclosure deed remained recorded against Stockman, and it deliberately took no action to correct the records at the Registry of Deeds.

116.    That a portion of Stockman's regular monthly mortgage payment was escrowed both for property insurance and also for property taxes on the home.

117.    Subsequent to all of the above, Stockman made numerous improvements to the home including railings, porch, lawn, stone walls, drainage, other miscellaneous repairs and improvements.

118.    That at the end of January 2010, January 2011, and January 2012, Stockman received mortgage interest statements, from Wells Fargo, for income tax

preparation purposes showing what Stockman had paid in interest, on his HAMP Promissory Note.

119. That in reliance on the same, Stockman prepared and filed his Federal Income Tax returns for all of the aforementioned years, taking the mortgage interest deduction on IRS 1040 Form, Schedule A.

120. In the early months of 2012, Stockman began to have health related problems, causing him to lose income and struggle financially.

121. That beginning in April 2012, Stockman began to miss his HAMP Note payments.

122. That by letter dated October 31, 2012, Wells Fargo sent Stockman a notice that he was delinquent on his HAMP Note payments.

123. That on December 7, 2012, Stockman sent Wells Fargo $2,400.00 to make partial payment on his mortgage arrearage.

124. That subsequently, by letter dated January 2, 2013, Wells Fargo notified Stockman that his mortgage was going into foreclosure again.

125. That the very next day, January 3, 2013, Wells Fargo sent Stockman a foreclosure prevention letter from a “Home Preservation Specialist,” to seek alternatives to Wells Fargo foreclosing on Stockman.

126. That in response to receiving the aforementioned two letters, Stockman was in immediate contact with Wells Fargo to try and clear the arrearage on his loan.

127. That representatives of Wells Fargo refused to speak with him and told Stockman he had to contact the law office handling the foreclosure, Marinosci Law Group, PC (hereafter “Marinosci”).

128.    That Stockman was in immediate contact with Marinosci requesting information as to the exact amount for him to reinstate his loan from default to "current," by making payment.

129.    That Stockman spoke with Danielle J. DeLisle, a paralegal at Marinosci.

130.    That in response to Stockman's request, Marinosci, on behalf of Wells Fargo, sent Stockman a reinstatement letter, dated January 14, 2013, by both email and postal mail.  See Exhibit 7.

131.    That the aforementioned "reinstatement letter" advised Stockman that $7,568.69 would reinstate his mortgage, if paid by January 25, 2013.

132.    That in response to the same, Stockman immediately went to his retirement account and after filling out a "hardship request," withdrew $7,568.69 to reinstate his loan and cancel the foreclosure.

133.    That on January 24, 2013 (the day prior to the due date in the reinstatement letter) Stockman received funds from his retirement account and he immediately attempted to pay over this money to both Wells Fargo and/or its agent, Marinosci.

134.    That Marinosci refused to accept the reinstatement funds because the firm had performed a title examination and found that Fannie Maey was the owner of Stockman's residence and that Stockman no longer had any ownership interest in the home, notwithstanding the agreement to "rescind" the foreclosure with Vong and Havick in May and July, 2010.

135.    The Marinosci representative told Stockman that he had to contact Wells Fargo directly as his loan should be in the "REO Department."

136.    That Stockman did not understand what the Marinosci paralegal meant by the "REO Department," but he did also attempt to contact Wells Fargo and tender reinstatement funds on January 24, 2013.

137.    That Wells Fargo deliberatively and intentionally refused to accept the reinstatement funds, offered by Stockman, telling him he had to deal with the attorney handling the foreclosure.  Even though, this same attorney had refused to accept the reinstatement funds.

138.    From the period of January 24, 2013 to March 22, 2013, because of communications from Wells Fargo, Stockman came to understand that the foreclosure deed had not been "rescinded."  Notwithstanding his HAMP Modification, and the agreement with Wells Fargo in 2010, at the time of the HAMP Modification Agreement.

139.    On March 22, 2013, Stockman, again, attempted to get Wells Fargo to accept the reinstatement funds and attempted to work out a resolution with Wells Fargo representatives.

140.    That in response to Stockman's written letter of March 22, 2013, Wells Fargo sent Stockman a letter, dated April 5, 2013, advising Stockman that a second attorney had been engaged for the foreclosure process and that he needed to obtain reinstatement from the new firm.  See Exhibit 8.

141.    That subsequent to the above, the Harmon Law Offices, PC, and sent Stockman a reinstatement letter dated April 11, 2013, a copy of which is attached to this Complaint.  See Exhibit 8.

142.    That on May 3, 2013, the Harmon Law Office sent a second reinstatement letter, again in pursuance of the "foreclosure process" demanding an unreasonable

sum, notwithstanding that the Stockman home had been foreclosed upon in 2010, contrary to Wells Fargo's promises, assurances, statements, and agreements with Stockman and Nahed.  Said reinstatement letter includes unreasonable sums and additional fees related to foreclosure activity.  See Exhibit 9.

143.    That Fannie Mae and/or Wells Fargo are fiduciaries who hold duties to Stockman under New Hampshire law as it relates to foreclosure, to proceed reasonably. Murphy v. Financial Development Corp. 126 NH 536 (1985).

144.    That the failure of Fannie Mae and Wells Fargo to:

- cancel the foreclosure;

- record a corrective Deed negating the foreclosure;

- refusing to accept properly offered "reinstatement" funds and unreasonably increasing the amounts owed due to "foreclosure" activity caused Stockman emotional distress, manifesting in sleeplessness, increased nervousness and anxiety, and weight changes.

## IV.    CAUSES OF ACTION

### A. Federal Fair Debt Collection Practices 15 U.S.C. 1692, et seq.

145.    Stockman repeats, re-alleges, and incorporates by reference, as if fully set forth in this count, each and every allegation contained above and each statement in all documents affixed hereto.

146.    As servicer for Fannie Mae, Wells Fargo is a "debt collector" as defined under the Federal Fair Debt Collection Practices Act (hereafter "FDCPA").  That all actions, set forth above involving Wells Fargo, were in its capacity as a "debt collector."

147.   That pursuant to §1692 (e) of the FDCPA, Wells Fargo was prohibited from using false, deceptive, or misleading representations or means in the collection of the debt owed by Stockman to Fannie Mae.

148.   That pursuant to §1692 (f) of the FDCPA, a debt collector may not use unfair or unconscionable means to collect a debt.

149.   That Wells Fargo made repeated violations of §1692e and/or §1692f by making false statements that Stockman's loan was being considered for a HAMP Modification prior to the foreclosure sale, when no such evaluation was made.

150.   That Wells Fargo violated §1692e and/or §1692f of the FDCPA by scheduling a foreclosure sale when Stockman had been deliberately led to believe that his loan was being considered for a HAMP Modification and an answer to his request for a HAMP Modification would be forthcoming in a reasonable timeframe.

151.   That Wells Fargo violated §1692e and/or §1692f by going forward with the foreclosure sale of February 19, 2010 after telling Stockman that it would be postponed, denying Stockman the right to petition the Superior Court of the State of New Hampshire, as is his right under RSA 479:25.

152.   That Wells Fargo violated §1692e and/or §1692f of the FDCPA by recording the foreclosure deed and by failing to record a corrective instrument, after discovering what had transpired.

153.   That Wells Fargo violated §1692e and/or §1692f of the FDCPA by making statements to Stockman and Nahed that it would "rescind" the foreclosure and that Stockman was going to receive a HAMP Modification via the telephone communication of May 27, 2010.

154. That Wells Fargo violated §1692e and/or §1692f by failing to take action to convey the property from Fannie Mae to Stockman, or otherwise, “rescind” the foreclosure deed, when it sent Stockman a HAMP Modification Agreement on or about July 2, 2010.

155. That Wells Fargo violated §1692e and/or §1692f of the FDCPA by sending Stockman, subsequent to July 2, 2010, each and every month, a monthly statement showing that he had a HAMP mortgage loan, and each and every monthly communication constitutes a separate “act” of falsity and/or an unfair practice under §1962e and/or §1962f, respectively.

156. That Wells Fargo violated §1962e and/or §1962f of the FDCPA by sending Stockman, for the years 2010, 2011, 2012 and 2013, mortgage interest statements showing he was entitled to a mortgage interest deduction on his Federal Income Tax Returns, because of his lack of ownership in the real estate due to the foreclosure deed, he was not eligible for such an I.R.S. tax deduction.

157. That Wells Fargo, on an annual basis, violated §1962e and/or §1962f of the FDCPA by causing Stockman to believe he had valid homeowners insurance, causing him, through the escrow, to pay for homeowners insurance when in fact, he was not a homeowner and was not eligible for said insurance coverage.

158. That Fannie Mae and Wells Fargo, in violation of §1962e and/or §1962f of the FDCPA, added unreasonable fees, expenses and charges to Stockman’s loan, notwithstanding the wrongful acts described above in improperly processing the HAMP Modification and in foreclosing.

159.    That Wells Fargo made repeated violations of §1962e and/or §1962f of the FDCPA when it told Stockman in 2013, that he was going to be foreclosed upon because, in fact, he had already been foreclosed upon.

160.    That each and every communication, Wells Fargo made through the Marinosci Law Firm is a violation of §1962e and/or §1962f of the FDCPA including, but not limited to, his "reinstatement letter" received from Marinosci, for which Wells Fargo is chargeable.

161.    That after learning of its error, Wells Fargo violated the above-cited §1962e and/or §1962f of the FDCPA by continuing to communicate with Stockman that he was "in foreclosure" and by further referring Stockman's HAMP loan to the Harmon Law Offices for foreclosure related activity and each communication from Wells Fargo and its foreclosure agent, Harmon, constitutes a separate violations of the FDCPA.

162.    That lastly, Wells Fargo committed a violation of the above-cited §1962e and/or §1962f of the FDCPA in its refusal to accept Stockman's payment offer to reinstate the loan on January 24, 2012, at a time when Wells Fargo could have taken the money and corrected the foreclosure deed problem by re-conveying the property to Stockman.

163.    As a result of all of the above, Stockman is entitled to actual damages or, alternatively, statutory damages of $1,000.00 pursuant to §1692k (9)(2)(A) and his attorney's fees as authorized by §1692k(a)(3).

**B.  New Hampshire Unfair Debt Collection Practices, NH RSA Chapter 358-C**

164.    Stockman repeats and re-alleges, each and every allegation contained above and all of the statements, as represented in the documents attached to this Complaint.

165.    That both Wells Fargo and Fannie Mae are both "debt collector(s)" as that term is defined under NH RSA 358-C:1 VIII.  That all of the actions, omissions, statements, communications, and representations, described above, constitute Unfair and/or Deceptive acts and/or practices in violation of RSA 358-C:2 and/or RSA 358-C:3.

166.    That by virtue of all of the above, Fannie Mae and its agent, Wells Fargo, are liable to Stockman for all of his actual damages and/or statutory damages, pursuant to RSA 358-C:4 and Stockman's Attorney's fees as also authorized under RSA 358-C:4 IV.

**C.  New Hampshire Unfair and Deceptive Business Practices**

167.    Stockman repeats, re-alleges and incorporates every allegation, statement, and claim, set forth above, including but not limited to IV A. (Federal Fair Debt Collection violations), as well as IV B. (New Hampshire Unfair Debt Collection violations), and/or attached to this Complaint as an exhibit.

168.    That the acts, omissions, statements and/or conduct constitutes an Unfair and Deceptive Business Practice, within the meaning and definition of  RSA 358-A:2.

169.    That further, all of the actions complained above entitle Stockman to actual and/or alternatively, statutory damages, including multiple damages for willful and/or knowing violation, plus attorneys fees, as authorized under RSA 358-A:10.

170. That both Wells Fargo and Fannie Mae are liable to Stockman for unfair and deceptive business practices as outlined in this Count.

**D. Breach of Contractual Covenants of Good Faith and Fair Dealing (HAMP Modification after July 2, 2010)**

171. Stockman repeats, re-alleges and incorporates every allegation, statement and claim, set forth above or made in an exhibit attached to this Complaint.

172. That both Wells Fargo and Fannie Mae, in entering into a HAMP Modification Agreement and in the initial, had a duty of good faith and fair dealing. Centronics Corp. v. Genicom Corp. 132 NH 133 (1989). That in proceeding in the HAMP Modification Agreement, Fannie Mae through its agent, Wells Fargo, acted in bad faith by proceeding with a HAMP Modification in July 2010 and not correcting the foreclosure deed, filed with the Merrimack County Registry of Deeds, by placing title back into Stockman's name, and by refusing to accept the "reinstatement" funds Stockman attempted to pay on January 24, 2013.

173. As a result of Wells Fargo and Fannie Mae proceeding with the HAMP Modification and not correcting the records at the Merrimack County Registry of Deeds, so as to put title back into Stockman's name, Stockman has been damaged.

174. That Stockman's damages include principal, interest, late fees, and other charges under the HAMP note, which he could have avoided by filing bankruptcy, had he known that he was no longer the owner of the property.

175. That in addition, Stockman had damages in the form of paying monthly HAMP payments (including property taxes, for the Fannie Mae property and homeowners insurance), which he was not eligible for, to the unconscionable benefit of Fannie Mae.

176. That in addition, Stockman made improvements that he was not obligated otherwise to make, to the property owner by Fannie Mae, to his damage.

177. That Stockman's damages also include the necessity of hiring an accountant to correct his income tax returns, to reflect that fact that he was not eligible for a mortgage interest deduction, based upon the statements issued by Wells Fargo in the years 2010 through 2013.

178. That Fannie Mae is liable to Stockman for breach of the HAMP modified contract, contrary to the covenants of good faith and fair dealing.

**E. Detrimental Reliance and Unjust Enrichment (Alternative to Breach of Contract Good Faith and Fair Dealing)**

179. That this Court is plead as an alternative to the Count set forth above, involving breach of contractual covenants of good faith and fair dealing.

180. Stockman repeats and re-alleges each and every allegation and statement contained above, and incorporates all of the statements in the exhibits, into this Count, by way of reference.

181. That in the absence of a contractual agreement, a trial court may require an individual to make restitution for unjust enrichment if the individual received a benefit which would be unconscionable to retain. Petrie-Clemons v. Butterfield 122 NH 120 (1982).

182. That unjust enrichment may exist when an individual received a benefit as a result of his wrongful acts or, where the individual innocently receives a benefit and passively accepts it. Id.

183.    That a trial court should determine whether the fact and equities of a particular case warrants a remedy of restitution from detrimental reliance/unjust enrichment. Id.

184.    That the correct measure of an award for restitution for unjust enrichment is the value of the benefit received by the unjustly enriched party.  Id.

185.    That both Fannie Mae and Wells Fargo have been unjustly enriched.

186.    That by virtue of Stockman's detrimental reliance on Wells Fargo's representation that the foreclosure deed would be "rescinded," after Nahed's conversation on May 27, 2010 and also, when the HAMP Modification Agreement was mailed to Stockman on July 2, 2010, Fannie Mae and Wells Fargo have been unjustly enriched.

187.    That Wells Fargo received HAMP incentive funds from Fannie Mae, as agent for the Treasury Department, because the approval of the HAMP Modification process.

188.    That in addition, Fannie Mae received HAMP incentive funds from the Secretary of the Treasury, as holder of the mortgage and also received the benefit of Stockman making mortgage payments, following the HAMP Modification, which they would not have received had Stockman known that he no longer owned his home, to the unjust enrichment of Fannie Mae.

189.    That further, Stockman made improvements to the real estate owner by Fannie Mae following the foreclosure sale that he would not have made had Stockman known that he no longer owned his home, thus enriching Fannie Mae at Stockman's expense.

190. That further, Fannie Mae has been enriched by Stockman's payment of HAMP mortgage payments (including property taxes and homeowner's insurance), on the home, which is owned by Fannie Mae.

191. That Stockman requests that this Honorable Court, equitably, provide him with restitution for all payments and monies paid to Fannie Mae, subsequent to July 2, 2010, plus the enhanced value of the improvements to the home by Stockman, plus restitution for any monies paid by Stockman, plus any monies either Fannie Mae or Wells Fargo received by and through the HAMP incentive program from the Treasury, as a result of the modification which occurred on or about July 2, 2010.

**F. New Hampshire RSA Chapter 361-C**

192. Stockman repeats and re-alleges each and every allegation and statement contained above, and incorporates all of the statements in the exhibits, into this Count, by way of reference.

193. That pursuant to NH RSA 361-C:2 where a consumer contract or evidence of indebtedness provides for attorney's fees to be awarded to a creditor in any action of suit, said contract must also provide for the reasonable Attorney's fees to any borrower or debtor in the event the event that the borrower of debtor prevails in a suit against the lender and/or creditor.

194. That Stockman's promissory note and mortgage, as modified under the HAMP program contains said language, above.

195. That specifically, the Mortgage Document, dated February 28, 2008, provides in paragraph 25 that the borrower is entitled to its attorney's fees for any action or proceeding, where the borrower prevails.

196.    That in addition, as provided in the promissory note signed by Stockman on February 28, 2008, he is entitled to his reasonable attorney's fees for bringing this action based upon the HAMP modified promissory note, of that date, and the wrongful actions by Wells Fargo and its principal, the current holder of the note/mortgage, Fannie Mae.

**G. Fraud (Failure to Postpone the Foreclosure Sale)**

197.    Stockman repeats and re-alleges each and every allegation contained above and also incorporates all representations in all exhibits affixed to this Complaint.

198.    That prior to the foreclosure sale in February of 2010, Wells Fargo made factual misrepresentations that it would postpone the foreclosure sale, due to the ongoing HAMP process.

199.    That the Wells Fargo employee who represented that the foreclosure sale of February 19, 2010 would be postponed knew, or should have known, the statement was false and with reckless and intentional disregard, proceeded with the sale as evidenced by their initial refusal to prevent the recording of the foreclosure deed, after learning that the sale had occurred.

200.    Specifically, Vong, of the Executive Office of the President of Wells Fargo, intentionally refused, within the first couple of months following the sale, to correct the problem, thus demonstrating his willful knowledge, scienter and disregard for Fannie's own guidelines and promises to Stockman not to foreclose, prior to the sale.

201.    That in reliance on the fraudulent misrepresentations of Wells Fargo, Stockman detrimentally did not seek injunctive relief in the Superior Court, as is his right under RSA 479:25 to a petition for a stay pending the HAMP process.

202. As a result of Wells Fargo's fraud, Stockman has been damaged including, payment of taxes and homeowners insurance; payment of excessive fees; payment of principal and interest which Stockman could have avoided, by filing a bankruptcy; improvements to the real estate; accounting fees necessary to correct his tax filings; and other incidental and consequential damages.

**H. Negligent Misrepresentation (Failure to Postpone the Foreclosure Sale)**

203. Stockman repeats and re-alleges each and every allegation contained above and incorporates all of the statements made in the exhibits affixed hereto.

204. This Count is plead as an alternative theory to the Count which immediately precedes it, for Fraud.

205. That prior to the foreclosure sale of February 19, 2010, Wells Fargo, a business made a business representation to a consumer (Stockman) that the foreclosure sale would be postponed and Stockman would be given an opportunity to proceed with an attempt at a HAMP Modification, as required under Federal Law.

206. That Wells Fargo had a duty, under the HAMP guidelines issued by Fannie Mae and the Act, to allow Stockman this opportunity to obtain a HAMP Modification.

207. That Wells Fargo had a fiduciary duty to truthfully represent whether the Fannie Mae sale would be postponed, or not. Murphy v. Financial Development Co. 126 NH 536 (1985).

208. That Wells Fargo breached the duties it has, as described above, thus causing Stockman damages.

209. That Stockman justifiably relied on Wells Fargo's misrepresentations that they would continue the February 19, 2010 sale date as, for the prior two foreclosure dates, they had continued the sale to allow the HAMP process to move forward.

210. That as a result of all of the above, Stockman has been damaged in an amount within the jurisdictional limits of this Court.

**I. Fraud**
**(Failure to "rescind" after the Foreclosure Sale Occurred)**

211. Stockman repeats and re-alleges each and every allegation contained above and incorporates all of the statements in the exhibits affixed to this Complaint.

212. That Wells Fargo and Fannie Mae committed an additional act of fraud upon Stockman by giving him a HAMP Modification in July of 2010, but not "rescinding" the foreclosure deed, as agreed by the parties.

213. That at the time of the HAMP Modification, May 27, 2010, Wells Fargo's employee, Joel Havick, advised Nahed that the HAMP Modification would result in title reverting out of Fannie Mae's name and back into Stockman's name.

214. That the aforementioned representation was false, reckless and intentionally made to cause Stockman to act on the HAMP Modification, which Stockman did.

215. That Havick knew the statement was false as, given the events which occurred prior to the foreclosure sale, Wells Fargo took no action to postpone the sale and/or forestall the recording of the foreclosure deed, notwithstanding its representations.

216. That Havick and Wells Fargo intended to deceive Stockman with the statements.

217.    That in reliance on the same, Stockman signed the HAMP process, rather than seeking to avail himself of other legal remedies.

218.    That as a result of all of the above, Stockman incurred the damages including:

- Payment of taxes on property he did not own;

- payment of homeowner's insurance on a home he did not own;

- payment of principal, interest and excessive fees charged by Wells Fargo on behalf of Fannie Mae;

- improvements to property that was owned by Fannie Mae;

- current need to file amended tax returns and retain an accountant for the same purpose due to the false filing of tax returns which included a mortgage deduction, for which Stockman was not entitled.

**J.  Negligent Misrepresentation
(Failure to make Corrections after the Foreclosure Sale Occurred)**

219.    Stockman repeats and re-alleges each and every allegation contained above and incorporates all of the statements in the documents attached to this Complaint as an exhibit.

220.    That this Count is plead as an alternative theory to the Count which immediately precedes it, for Fraud.

221.    That Wells Fargo and Fannie Mae are liable to Stockman for negligent misrepresentation.

222.    That between the period of May 27, 2010 and July 2, 2010, Wells Fargo representatives, in their business and professional capacity, made representations to

Stock that the execution of the HAMP Modification Agreement would result in the rescission of the foreclosure deed.

223.    That under the Act and HAMP guidelines, published by Fannie Mae, Wells Fargo held a duty to Stockman to truthfully represent what would occur, as part of the HAMP process.

224.    That Fannie Mae and Wells Fargo breached the duties imposed under the Act and HAMP Guidelines by falsely advising Stockman and/or Nahed what would occur during the HAMP process.

225.    That Wells Fargo and its employee breached the duties by failing to take necessary and proper action, after receiving the return of Stockman's HAMP agreement and payment to place the title back into Stockman's name.

226.    That as a proximate cause of said negligent misrepresentation, Stockman has been damaged.

227.    That Stockman justifiably relied on the representations which ultimately led to the HAMP Modification in July of 2010.

228.    That as a result of the above, Stockman incurred the damages including: Payment of taxes on property he did not own:

- payment of homeowner's insurance on a home he did not own;

- payment of principal, interest and excessive fees charged by Wells Fargo on behalf of Fannie Mae;

- improvements to property that was owned by Fannie Mae;

- the need to file amended tax returns and retain an accountant for the same purpose due to the false filing of tax returns which included a mortgage deduction, for which Stockman was not entitled;
- emotional distress.

**K. Negligence**
**(Stockman's HAMP requests, April 2009 through May 27, 2010)**

229. Stockman repeats and re-alleges each and every allegation contained above and incorporates all of the statements in the documents attached to this Complaint as an exhibit.

230. That as outlined above, both the Act and the guidelines, issued by Fannie Mae, impose duties on Wells Fargo to proceed through the HAMP process.

231. That Wells Fargo breached its duties, in a gross, unreasonable and negligent fashion, by:

- Not processing the paperwork in a reasonable and timely fashion;
- repeatedly and unreasonably asking for the resubmission of documents already provided;
- unreasonably scheduling a foreclosure prior to properly advising Stockman of an answer to his HAMP request;
- unreasonably failing to take corrective action to place the title back into Stockman's name, after the HAMP Modification had occurred;
- unreasonably sending the Stockman loan to the Marinosci Law Firm in January of 2013 and then refusing to accept the monies they had demanded and Stockman offer to pay, in a timely fashion;

- unreasonably replacing the Stockman loan with the Harmon Law Firm and continuing to dunn Stockman with unreasonable and unnecessary charges, after had had previously offered to tender the monies they had demanded.

232.    That a proximate cause of the negligence described above, Stockman has been damaged.  Stockman's damages include:

- Emotional distress;

- unnecessary charges and fees assessed to his loan associated with any and all foreclosure activity;

- payment of taxes on property he did not own;

- payment of homeowner's insurance on a home he did not own;

- payment of principal, interest and excessive fees charged by Wells Fargo on behalf of Fannie Mae;

- improvements to property that was owned by Fannie Mae;

- the need to file amended tax returns and retain an accountant for the same purpose due to the false filing of tax returns which included a mortgage deduction, for which Stockman was not entitled.

**L.  Specific Performance**

233.    That Stockman repeats Stockman repeats and re-alleges and incorporates each and every statement, fact, and/or representation set forth above, as well as all statements made in the exhibits attached to this Complaint, in this Count.

234.   That this Honorable Court should enter an affirmative injunction requiring Fannie Mae to convey the property, back to Stockman, after deducting all of Stockman's damages awarded in this action.

235.   Specific Performance is an equitable remedy which rests in the sole discretion of this Court.

236.   That on or about January 14, 2013, Fannie Mae, through its foreclosure agent Wells Fargo and Marinosci Law, sent to Stockman a reinstatement letter offering to allow Stockman to keep his home.

237.   That within the deadline described, Stockman obtained the funds necessary to reinstate the HAMP loan with Fannie Mae and attempted to tender the same to first, Marinosci and also, Wells Fargo.

238.   That Marinosci refused to accept the tender of funds because the property was already owned by Fannie Mae.

239.   That Wells Fargo refused to accept the tender of the funds because the matter had been placed with a foreclosure attorney.

240.   That the home at issue in this case is the primary residence for Stockman and his two children.

241.   That one of Stockman's children is a Type I Diabetic.

242.   That land is considered unique, as a matter of law.

243.   That no amount of damages can compensate Stockman for the loss of the home for himself and his children.

244.   Because of the gross and reckless acts of wells Fargo and Fannie Mae as outline above, this Honorable Court should exercise its discretion and issue an

affirmative injunction compelling Fannie Mae to re-convey the property to Stockman, after making downward revisions in the loan amounts claimed by Fannie Mae (which are both excessive and/or lacking in compensation for the wrongs [described in Counts above] done Stockman).

245.   The adequacy of a remedy at law and adequacy of damages must be determined after careful weighing of all particular circumstances of the case.  117 NH 477 (1977). Tuttle v. Palmer.

246.   In some cases involving promissory estoppel, a proper remedy may be specific performance.  Jackson v. Morse 152 NH 48 (2005).

247.   That Wells Fargo should be held to its promise and reinstate Stockman's mortgage and Stockman's home should be returned to him.

WHEREFORE THE PLAINTIFF PRAYS:

A.      That this Honorable Court, following the conclusion of this proceeding, enter a Decree of Specific Performance order Fannie Mae to re-convey the property to Stockman;

B.      That Stockman be awarded damages, as plead above, for the wrongful acts of Fannie Mae and Wells Fargo; and

C.      For such other and further relief as is just and equitable.

Respectfully Submitted
ROBERT STOCKMAN
By His Attorney


Dated:  March 21, 2014              /s/ Daniel C. Proctor, Esq.
                                    Daniel C. Proctor, Esq., ID#: 6589
                                    P.O. Box 3544
                                    Concord, NH 03302-3544
                                    603-228-8226

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE

ROBERT STOCKMAN

Case No.: 1:13-CV-00323-JL

v.

WELLS FARGO HOME MORTGAGE,
A DIVISION OF WELLS FARGO BANK, N.A.;
THE FEDERAL NATIONAL MORTGAGE
ASSOCIATION; and CANDACE STOCKMAN

**CERTIFICATE OF SERVICE**

I, Daniel C. Proctor, Esquire, attorney for the Plaintiff, hereby certify that I have caused to be served on this day a true copy of the First Amended Complaint Seeking Damages and Specific Performance upon the following parties by electronic service (unless another method is indicated in parentheses), addressed as indicated below:

Mark A. Darling, Esq.
Daniella Massimilla, Esq.
Counsel to Wells Fargo and Fannie Mae
Litchfield Cavo LLP
6 Kimball Lane, Suite 200
Lynnfield, MA 01940-2682

Dated at Concord, New Hampshire, this 21st day of March, 2014.

/s/Daniel C. Proctor, Esq.
Daniel C. Proctor, Esq.
P.O. Box 3544
Concord, NH 03302-3544
(603) 228-8226